AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California



|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  **19MJ1985** |
| One iPhone 6, white in black case, with serial number | ) |
| DNPQ94MCGRYH, currently located at 10385 Vista | ) |
| Sorrento Parkway, San Diego, CA 92121 | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | Conspiracy |
| 15 U.S.C. § § 78j(b), 78ff, and | Securities Fraud |
| 17 C.F.R. § 240.10b-5 | |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Stephanie Schuld
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___5/14/19___

_____
*Judge's signature*

City and state:  San Diego, California

U.S. Magistrate Judge Michael S. Berg
*Printed name and title*

**AFFIDAVIT**

I, Stephanie Schuld, being duly sworn, state as follows:

**INTRODUCTION**

**A.    Purpose of This Affidavit**

1.    I make this affidavit in support of an application for a second follow-on search warrant (the "Second Follow-On Warrant") to seize additional items found on a cellular telephone belonging to Oliver Lindsay – an iPhone 6, white in black case, with serial number DNPQ94MCGRYH (the "Subject Telephone") – pursuant to a search warrant issued by the Honorable Barbara L. Major on December 14, 2018 in 18-mj-6297 (the "Prior Warrant") and an initial follow-on search warrant issued by the Honorable Linda Lopez on March 6, 2019 in 19-mj-0964 (the "Initial Follow-On Warrant", and together with the Prior Warrant, the "Prior Warrants").  This affidavit incorporates by reference the affidavits in support of the Prior Warrants, which are attached as Exhibits A and B.

2.    On June 29, 2018, a grand jury sitting in the Southern District of California handed down an indictment against defendants Oliver Lindsay and Gannon Giguiere.  The indictment alleges, *inter alia*, that Lindsay and Giguiere conspired to commit securities fraud, and committed securities fraud, in connection with the stock of Kelvin Medical, Inc., and that Giguiere previously did the same in connection with the stock of Eco Science Solutions, Inc.  A superseding indictment, handed down on January 25, 2019, added manipulative trading in Kelvin Medical stock as an object of the conspiracy.

3.    Lindsay and Giguiere were arrested on July 5, 2018.  They were both carrying cell phones, which were seized.[1]  The Subject Telephone is one of the cell phones seized from Lindsay.  Agents are reviewing exported data from the Subject Telephone to identify

---

[1] Defendant Giguiere's cell phone was searched pursuant to a separate search warrant, but agents were unable to access the content of the data on that phone.

materials which are subject to seizure pursuant to the Prior Warrants.  More specifically, the Prior Warrant authorizes a search for evidence surrounding the Kelvin Medical market manipulation scheme, and the Initial Follow-On Warrant authorizes a search for evidence surrounding insider trading in a separate company, Long Island Iced Tea Corp. (ticker symbol: LTEA)  The Initial Follow-On Warrant allows the seizure of items from November 1, 2017 to July 5, 2018.  The purpose of this Second Follow-On Warrant is to expand this timeframe to include communications dating back to September 1, 2017.

4.     Based on the information below, I submit that there is probable cause to believe that additional information from the Subject Telephone, not currently subject to seizure under the Prior Warrant, will contain evidence of the following crimes: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; and securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5; as more fully identified in Attachment B.

5.     All the conclusions and beliefs set forth in this affidavit are based on my training and experience, conversations with other agents who have extensive experience in securities fraud investigations, and my knowledge of the facts of this investigation.  All of the dates, times, and amounts listed in this affidavit are approximate.  This affidavit sets forth only the facts necessary to support the issuance of the requested search warrant; it does not include each and every fact known to me concerning this investigation.

**B.**     **Training and Experience**

6.     I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since January 2010.  I am currently assigned to the San Diego Division's financial crimes squad.  Prior to working financial fraud cases, I spent more than four years investigating public corruption.

7.     Before I joined the FBI, I received a Bachelor of Arts degree in business with an emphasis in accounting and finance from Bethel University.  Following graduation, I

was employed by a publicly-held Fortune 500 company as a Staff Accountant, Division Accounting Manager, and lastly, a Controller. While at this company I gained more than five years of experience compiling and analyzing financial information.

8.     As a Special Agent, I received basic federal law enforcement training at the FBI Academy in Quantico, Virginia. My training at the FBI Academy included instruction in how to conduct searches in accordance with the Fourth Amendment, the drafting of search warrant affidavits, and the probable cause standard.

9.     During my career as an FBI Agent, I have investigated various white collar crimes, including mail fraud, wire fraud, embezzlement, bribery, money laundering, public corruption, and conspiracy to commit these offenses.

## PROBABLE CAUSE

**C.     Pump and Dump / Market Manipulation of Kelvin Medical Stock; Insider Trading in Long Island Iced Tea Corp.**

10.     As outlined in Exhibit A, there is probable cause to believe that defendants Lindsay and Giguiere were part of a conspiracy to commit securities fraud by engaging in a pump-and-dump and market manipulation scheme in connection with Kelvin Medical stock, and that Giguiere previously did so in Eco Science Solutions stock. Those schemes are the subject of allegations in the indictment and superseding indictment in *U.S. v. Giguiere, et al.*, 18CR3071-WQH.

11.     As outlined in Exhibit B, there is probable cause to believe that defendants Lindsay and Giguiere were part of a conspiracy to commit securities fraud by engaging in insider trading in the stock of LTEA, including by conspiring to trade stock in this company, on the basis of confidential, insider information. This includes trades made in advance of a December 21, 2017, LTEA press release (the "Blockchain Press Release") entitled "Long Island Iced Tea Corp. to Rebrand as 'Long Blockchain Corp.': Corporate Focus to Shift Towards Opportunities Strategic to Blockchain technology."

12.     The Prior Warrants also set forth facts giving rise to probable cause to believe that evidence of these crimes would be found in the Subject Telephone.  Both of the Prior Warrants rely, in part, on information provided by CHS.[2]

**D.     Review of the Subject Telephone Pursuant to the Prior Warrants**

13.     Since extracting data from the Subject Telephone, agents have been reviewing its contents in an effort to identify and seize the evidence described in Attachments B to the Prior Warrants.

14.     During their review of these communications, agents identified several encrypted text messages in which Lindsay and other individuals discuss what appears to be confidential information regarding LTEA.

15.     Many of the messages within these text strings were sent from November 1, 2017 to July 5, 2018, and therefore may be seized pursuant to the Initial Follow-On Warrant.  However, some of the messages in these text strings were sent before November, 1, 2017.

### Example 1

16.     For example, a WhatsApp text string between Lindsay and a user identified on Lindsay's phone as "Eric W", who I believe is Eric Watson[3] based on the other

---

[2] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme relating to the 2012 manipulation Cuba Beverage Company.  When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice.  CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

[3] As described in the Initial Follow-On Warrant, Eric Watson was a significant shareholder in LTEA in late 2017.  A Form S-1 filed by LTEA with the Securities and Exchange Commission stated that Watson owned 1,502,821 LTEA shares, which

evidence in this case, began on September 11, 2017, and continued until December 18, 2017. This text string contains a continuing discussion of information concerning "tea," "blockchain," and "LTEA," all of which I believe to refer to Long Island Iced Tea Corp.

17. On September 19, 2019, Watson texted Lindsay: "We seem to have a hold up with tea? Paul saying you need more time? We really should [sic] moving don't you think?" Lindsay responds, including by stating: "No real delay form me … Needed all the structure info … Got that …"

18. On September 20, 2019, Lindsay texted Watson: "Rod can't reach paul to nail down IR contact … Need that asap." Watson responded: "Tell him to talk to Julian asap. Paul out of action."

19. On September 21, 2017, Watson and Lindsay exchanged the following texts:

Watson: "Let's get going."

Lindsay: "Convince Julian."

Watson: "That won't be a problem. We will first need to close the capital raise tomorrow. When Tom confirms his involvement we will close."

20. On November 3, 2017, Watson sent the following text message, which based on my training and experience and other evidence obtained in this case, I believe refers to common aspects of a pump-and-dump campaign – specifically, the "pump," which often includes the coordinated use promotions, calls rooms, and corporate news releases – surrounding LTEA.

---

represented a 15.1% beneficial ownership in the company, on or about November 20, 2017.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> 447525444555@s.whatsapp.net Eric W
>
> Eric here is a detailed list at cost:
>
> 3 authors each are around $5k includes distribution
>
> Call center is $5k per caller per week minimum of 4 callers. Landing
>
> Page $5k
> Ad spend on landing page (Yahoo, MSN, FB) $2k daily
> Blogger $5k month (Daily post)
>
> Video & Distribution (2) each will run about $5k if we want a full scale write up on the company
> pager ($3,500 extra)
> News Drops:
>
> Lion & Awesome (30k) 2 days (we used them in the past) SCS LTD.
>
> ($45k) 2 days
> Small Cap Trader ($25k) 2 days
>
> Let me know your thoughts. Remember we need lead time of 1-2 weeks tobgwt everything done
> for Article we need to establish who we are interviewing and what the focus needs to be.
>
> Status: Read Platform:
> Mobile
>
> 11/3/2017 6:55:02 PM(

15
16
17

    21.    The text string continues through December 18, 2019, and includes detailed discussions of the expected timing and content of the Blockchain press release, which LTEA distributed on December 21, 2019.

18
19
20
21
22

    22.    Based on my training and experience, and other evidence gathered in this case, the portion of this text string that was exchanged before November 1, 2017, provides substantial context surrounding the LTEA insider trading conspiracy, and identifies other possible conspirators.

### Example 2

23
24
25
26

    23.    As another example, a WhatsApp text string between Lindsay and a user identified on Lindsay's phone as "Julian Davidson" began on September 22, 2017 and continued until November 10, 2017.

27
28

    24.    This text string contains a continuing discussion of information concerning a promotional campaign – often referred to as an "investor relations," or "IR," program –

and funding that Lindsay was expected to, and apparently did, provide in connection with LTEA.

25.    On September 26, 2017, Davidson texted Lindsay: "I want to get started on the IR program but I don't have the charges aligned to the contract yet."

26.    On October 2, 2017, Davidson texted Lindsay: "Hi Ollie – I'm getting a little nervous – and will need to delay the close again – any progress on your end? Cheers Julian."

27.    On October 3, 2017, Lindsay texted Davidson documentation of a $681,625 wire transfer from Weiser AM to Long Island Brand Beverages. Based on other evidence in this case, I believe that "Weiser AM" refers to Weiser Asset Management, an entity with which Lindsay worked and for which Lindsay engaged in securities trading activity during 2017 and 2018.

28.    Based on my training and experience, and other evidence gathered in this case, the portion of this text string that was exchanged before November 1, 2017, provides substantial context surrounding the LTEA insider trading conspiracy, supports an inference that Lindsay invested in LTEA before the Blockchain press release, and identifies other possible conspirators.

**Example 3**

29.    As a final example, a WhatsApp text string between Lindsay and a user identified on Lindsay's phone as "The R." began on September 15, 2017 and continued until December 22, 2017. Within the text string, Lindsay refers to The R. as "Rodney."

30.    On September 20, 2017, Lindsay texted The R. a contact file with information surrounding "Julian Davidson." The file listed Davidson as the Executive Chairman of LTEA. Lindsay also stated: "Call him re LT … Asap." The R. responded: "Ok … Call me … Julian wants to know: How we know what our funds have been applied to. How we measure success."

7

31.     On September 22, 2017, Lindsay texted The R.: "Analytics on the LTEA investor portal will reveal activity … Chadwick will provide a monthly report of number of impressions our efforts are achieving."  Based on other evidence gathered during this case, I believe the reference to "Chadwick" concerns an entity known as Chedwick Marketing, a firm that was involved in funding promotional activities (the "pump") for stocks during 2017 and 2018, and the reference to "impressions" refers to the number of people who were exposed to the promotional efforts (e.g., the number of visits to a given promotional website, and the number of individuals contacted by phone rooms).

32.     On September 28, 2017, Lindsay texted The R.: "Why is Gannon losing his shit? … Can you communicate with him."  I believe "Gannon" refers to Giguiere based on other evidence gathered in this case, including the fact that Lindsay and Giguiere discussed via telephone calls and text messages payments to and from "Rodney" at "Chedwick."

33.     The pre-November 1, 2017 messages described above provide important context for messages about LTEA that were sent between November 1, 2017 and July 5, 2018.

34.     The timing of the communications described above give rise to probable cause to believe that the conspiracy to commit insider trading in LTEA stock began at least as early as September 1, 2017.

35.     For these reasons, this second follow-on application is being submitted to allow the seizure of evidence of this crime dating back to September 1, 2017.

## CONCLUSION

36.     Based on the foregoing, there is probable cause to believe that Giguiere and Lindsay conspired with each other and others to, and did, trade LTEA securities on the basis of material, non-public information, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5.  Further there is probable cause to

8

believe that the items to be seized in Attachment B will be found on the Subject Telephone as described in Attachment A.

Respectfully submitted,

Stephanie Schuld
FBI Special Agent

Subscribed and sworn to before me on May 14, 2019

HON. MICHAEL S. BERG
United States Magistrate Judge

9

## **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

One iPhone 6, white in black case, with serial number DNPQ94MCGRYH; currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121 (the "Subject Telephone").

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the SUBJECT TELEPHONE described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT TELEPHONE. The seizure and search of the SUBJECT TELEPHONE will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT TELEPHONE will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of September 1, 2017 to July 5, 2018:

a.  Tending to identify attempts to trade the stock of Long Island Iced Tea Corp., its predecessors, successors and affiliates (collectively, "LTEA"), on the basis of material, non-public information, including attempts to:

   1.  Obtain material, non-public information regarding LTEA.

   2.  Pass on to others material, non-public information regarding LTEA.

   3.  Promote the stock of LTEA including through call rooms, newsletters, or websites, including but not limited to, www.TheMoneyStreet.com.

   4.  Identify payments, and the routing of payments, for the promotion of the stock of LTEA.

   5.  Buy or sell the stock of LTEA.

   6.  Distribute proceeds from the sale of the stock of LTEA.

b.  Tending to identify accounts, profiles, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the trading of LTEA stock based on material, non-public information.

c.  Tending to identify payment, payment methods, or other monetary

transactions relating to the trading of LTEA stock based on material, non-public information.

d. Tending to identify co-conspirators, criminal associates, or others involved in the promotion or trading of LTEA stock based on material, non-public information.

e. Tending to identify travel to or presence at locations involved in the trading of LTEA stock based on material, non-public information.

g. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

h. Provide context to any of the communications, records, or data described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the Exhibit A.

# Exhibit A

NOT FOR PUBLIC VIEW

AO 9. Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  **18MJ6297**
One iPhone 6, white in black case, with serial number )
DNPQ94MCGRYH, currently located at 10385 Vista )
Sorrento Parkway, San Diego, CA 92121 )

## SEARCH AND SEIZURE WARRANT

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

One iPhone 6, white in black case, with serial number DNPQ94MCGRYH, currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

**YOU ARE COMMANDED** to execute this warrant on or before  *12/28/18* _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Barbara L. Major _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: *12/14/18 at 9:06 am*

_____
*Judge's signature*

City and state:  San Diego, California _____  United States Magistrate Judge Barbara L. Major
_____
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

One iPhone 6, white in black case, with serial number DNPQ94MCGRYH, currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121 (the "Subject Telephone").

**ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the SUBJECT TELEPHONE described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT TELEPHONE. The seizure and search of the SUBJECT TELEPHONE will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT TELEPHONE will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of January 1, 2016 to July 5, 2018:

a. Tending to identify attempts to manipulate the market for the stock of Kelvin Medical, Inc. (the "Subject Company"), including attempts to:

    1. Obtain control of or the stock of the Subject Company.

    2. Conceal control of the Subject Company or stockholding in the Subject Company.

    3. Impact the price or trade volume of stock in the Subject Company.

    4. Create or revise corporate disclosures.

    5. Promote the Subject Company or the stock of the Subject Company, including through call rooms, newsletters, or websites, including www.TheMoneyStreet.com.

6. Buy or sell the stock of the Subject Company.

7. Distribute proceeds from the sale of the stock of the Subject Company.

b. Tending to identify accounts, profiles, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the manipulation of the stock of the Subject Company.

c. Tending to identify payment, payment methods, or other monetary transactions relating to manipulating the stock of the Subject Company.

d. Tending to identify co-conspirators, criminal associates, or others involved in manipulating the stock of the Subject Company.

e. Tending to identify travel to or presence at locations involved in manipulating the stock of the Subject Company.

f. Tending to identify the user of, or persons with control over or access to, the SUBJECT TELEPHONE.

g. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

h. Provide context to any of the communications, records, or data described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

The seizure and search of the cellular phone(s) shall follow
the procedures outlined in the supporting affidavit.

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

One iPhone 6, white in black case, with serial number DNPQ94MCGRYH, currently located at 10385 Vista Sorrento Parkway, San Diego, CA 92121

Case No.

DEC 1 4 2018

CLERK OF DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

18MJ6297

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | Conspiracy |
| 15 U.S.C. §§ 78j(b), 78ff, and | Securities Fraud |
| 17 C.F.R. § 240.10b-5 | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI SA John Roberts
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/14/18

*Judge's signature*

City and state:  San Diego, California

U.S. Magistrate Judge Barbara L. Major
*Printed name and title*

AP-A

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, John W. Roberts, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the San Diego Division. I have been employed by the FBI as a SA since October 1999. I graduated from the College of the Holy Cross in 1995, with a degree in Accounting and Mathematics. From 1995 to 1999, I worked as a financial auditor at a major international accounting firm. During this time, I also received a license as a Certified Public Accountant in the Commonwealth of Massachusetts.

2. While working as a SA, I have conducted, or participated in, investigations of various violations of federal law, including white collar crime. Among other things, I have conducted, and assisted in, the execution of numerous arrest warrants, search warrants, and seizure warrants in investigations. Since June 2000, I have been assigned to squads responsible for investigating white collar offenses. The squad to which I am currently assigned specializes in investigating all forms of economic crime, including corporate, securities, financial institution, bank and investment fraud.

3. In the nearly nineteen years I have been assigned to investigate financial crimes, I have become experienced in investigations involving all types of economic crimes, including the methods and means employed by individuals who engage in these offenses. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI, other federal agents and officers, and securities regulators who have expertise in investigations involving economic crime. I have attended training

1 | courses covering the topics of fraud and white collar crime, and other
2 | types of criminal violations.

3 |     4.   The facts set forth in this affidavit are based on my own
4 | personal knowledge; knowledge obtained from other individuals during my
5 | participation in this investigation, including other law enforcement
6 | officers; my review of documents and records related to this
7 | investigation; recorded conversations with insiders; communications with
8 | others who have personal knowledge of the events and circumstances
9 | described herein; and information gained through my training and
10 | experience. Because this affidavit is submitted for the limited purpose
11 | of establishing probable cause in support of the application for a search
12 | and seizure warrant, it does not set forth each and every fact that I
13 | or others have learned during the course of this investigation

14 |     5.   This affidavit is made in support of an application to search
15 | the following cellular telephone:

16 |         a. One iPhone 6, white in black case, with serial number
17 |           DNPQ94MCGRYH (hereinafter referred to as "SUBJECT
18 |           TELEPHONE");

19 | for items that constitute evidence, fruits, and instrumentalities of
20 | violations of federal criminal law, namely, conspiracy to commit
21 | securities fraud in violation of 18 U.S.C. § 371, and securities fraud
22 | in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5
23 | occurring from January 1, 2016 through July 5, 2018.

24 |     6.   Based on my training and experience and the facts as set forth
25 | in this affidavit, there is probable cause to believe that violations
26 | of 18 U.S.C. § 371, and 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R.
27 | § 240.10b-5 have been committed by the user of the SUBJECT TELEPHONE.
28 | There is also probable cause to believe that a search of the SUBJECT

1 TELEPHONE (as more particularly described in Attachment A) will reveal
2 evidence of these crimes (as more particularly described in Attachment
3 B).

4                  PROBABLE CAUSE SURROUNDING THE CRIMINAL CONDUCT

5 THE INDICTMENT IN THIS CASE

6      7.   On June 29, 2018, a federal grand jury sitting in the Southern
7 District of California handed down a sealed indictment against Gannon
8 Giguiere and Oliver Lindsay.  The indictment, which the Court has since
9 unsealed, charges Giguiere and Lindsay with conspiracy to commit
10 securities fraud in violation of 18 U.S.C. § 371, and securities fraud
11 in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

12     8.   The indictment alleges a conspiracy to conduct two market
13 manipulation and pump-and-dump schemes.  One of those schemes involved
14 Giguiere's and Lindsay's manipulation of the stock of Kelvin Medical,
15 Inc., which began in or about October 2017, and continued until in or
16 about March 2018.  The second scheme involved Giguiere's manipulation
17 of the stock of Eco Science Solutions, Inc.; I am not aware of facts
18 indicating that Lindsay was involved in the latter scheme.

19 BACKGROUND

20      Pump-and-Dump Schemes Generally

21     9.   Based on my training and experience, and from consultation
22 with other agents and securities regulators, I know that fraudulent
23 schemes surrounding the issuance, marketing, and trading of and in the
24 stock of small, thinly-capitalized (or "microcap") companies have been
25 widespread for years.  Although these frauds vary in their particulars,
26 in a typical scheme co-conspirators (1) secretly obtain control over a
27 small company that has shares of stock that can be publicly-traded, (2)
28 artificially inflate the price of the stock (the "pump") through

                                     3

1  misleading corporate disclosures, call rooms, and stock promotion
2  techniques (including, for example, penny stock newsletters and internet
3  advertising), and (3) sell their stock into the rising market for
4  significant profits (the "dump"). Stock prices almost invariably go
5  down as a result of the dump, leaving innocent stockholders with
6  significant losses.

7      10.  There are many aspects to a successful manipulation scheme,
8  including the following:

9          a.   Reaching agreement on conspirator roles. Co-conspirators
10 often play various roles in market manipulation schemes. This is driven
11 by the development of particular competencies, and a desire to separate
12 activities so regulators and law enforcement have a harder time linking
13 all aspects of the scheme. Some people create, or obtain and clean up,
14 a corporate shell that is suitable for manipulation. Others promote the
15 stock through call rooms, internet pages, or penny stock newsletters.
16 Still others hold the conspirators' shares that they will sell into the
17 rising market and distribute the proceeds to the conspirators. All of
18 these players are essential to a successful scheme, and co-conspirators
19 sometimes reach an agreement on who covers what costs, and how much of
20 the proceeds will go to which conspirators.

21          b.   Controlling the company's outstanding shares.
22 Manipulators are more successful when they control larger blocks of free
23 trading shares. This allows them to impact the market price more easily,
24 and decreases the chances that other market participants will place
25 downward pressure on the stock price while the conspirators are trying
26 to increase the price.

27          c.   Using nominee accounts. Manipulators almost always
28 control bank and brokerage accounts, but often hold those accounts in

4

1   the name of other individuals or entities.   This hides the fact that,
2   e.g., those persons involved in the manipulation also manage and control
3   significant aspects of the business, and persons selling stock into a
4   rising market (the "dump") are also responsible for promotional efforts.
5   Spreading out the shares among a larger number of nominee accounts also
6   conceals that one person or group is responsible for most of the open-
7   market activity in a stock, and facilitates manipulative trading in the
8   stock.

9          d.   Press Releases and Corporate Developments.   Stock
10  manipulators are able to sell the majority of their shares at relatively
11  high prices by getting innocent investors interested in the stock.   Co-
12  conspirators often spend significant time developing an idea or product
13  that the Company is supposedly pursuing.   They then cause the company
14  to issue press releases.   These releases often have a nugget of truth
15  that is exaggerated or presented in a misleading way.   Press releases
16  are often issued in conjunction with efforts to promote the stock in
17  other ways.

18         e.   Stock Promotion.   Stocks are sometimes promoted through
19  high-pressure call rooms, stock newsletters, and advertisements on
20  finance websites.   The point of these efforts is the same as that of
21  press releases – to get everyday investors interested in the stock,
22  which will increase demand for the stock.   This has two salutary effects:
23  the stock's price and volume increase, and the co-conspirators have
24  enough people to whom to sell their stock at inflated prices.   Promotions
25  often tout recent corporate disclosures as a reason to buy the stock.

26         f.   "Building the Chart."   Co-conspirators commonly trade
27  stock between two or more accounts that they control, and engage in
28  other forms of manipulative trading.   Seeing a recent history of

1 increases in the price and volume of a given stock often incentivizes
2 investors who have been exposed to promotions – investors who look up
3 the stock chart on the internet can see upward trends that solidify
4 their decision to invest in the company.

5 g. Controlled Stock Sales. Co-conspirators often seek
6 steady, consistent and predictable movements in a stock's price and
7 volume. They are able to get and keep investors interested in the stock
8 if the price goes up steadily, as opposed to suddenly. This way, the
9 conspirators can sell shares for longer periods of time, and ultimately
10 sell more shares for higher prices, on average, than they can when there
11 are dramatic swings in prices and volumes. Co-conspirators also seek
12 to avoid sudden shifts because they would rather not attract the
13 attention of regulators and law enforcement. Even during the promotional
14 period, they also engage in manipulative trading to support the
15 appearance of strong investor demand for the stock.

16 h. Distributing the fraudulent proceeds. One person or
17 group of co-conspirators is often responsible for selling the
18 conspirators' shares into the market. They then often transfer money
19 through intermediary accounts, many of them offshore, when distributing
20 the proceeds to the co-conspirators who were responsible for other
21 aspects of the scheme, e.g., the company's management or the shell
22 broker.

23 The Individuals and Entities Involved

24 11. Gannon Giguiere – Based on information obtained from social
25 media websites, Giguiere has experience in information technology,
26 having worked as Senior Director of Search at AltaVista, the internet
27 search company. Based on his recorded statements, a review of the

28

6

1 website itself, and according to CHS,[1] Giguiere has operated a stock
2 promotion website called TheMoneyStreet.com since at least as early as
3 2016.   Based on the evidence gathered in this case, some of which is
4 discussed below, I believe Giguiere was involved in the manipulation of
5 the stock of Kelvin Medical, Inc. (Ticker: KVMD, or "Kelvin Medical"),
6 among others.

7    12.   CHS – CHS has admitted to investigators that he has been
8 involved in penny stock fraud for many years, and has had contact with
9 many other repeat players in the industry.   CHS states that, since at
10 least as early as 2016, he was involved in the promotion of stocks
11 through TheMoneyStreet.com.   CHS and his associate, Gannon Giguiere,
12 paid for advertisements on websites like Yahoo Finance, where a click
13 on the ad links to a TheMoneyStreet.com landing page touting a particular
14 stock. CHS is cooperating with the investigation, and has recorded
15 conversations and captured evidence of written communications with
16 Giguiere, Lindsay, and others regarding the manipulation of many stocks.

17    13.   Oliver Lindsay – According to U.S. law enforcement databases,
18 Oliver Lindsay ("Lindsay") is a Canadian citizen. According to CHS, and
19 Lindsay's statements during recorded phone calls, Lindsay primarily
20 resided in Georgetown, Cayman Islands before his arrest in this case.
21 Based on Lindsay's statements during recorded phone calls, Lindsay
22 operated an offshore brokerage firm known as CMGT Capital Management

23

24 [1] In August 2017, the United States charged CHS in a sealed complaint with
conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for
25 his role in a scheme relating to the 2012 manipulation Cuba Beverage Company.
When approached by agents, CHS agreed to cooperate, the arrest warrant was
26 not executed, and the complaint was later dismissed without prejudice.   CHS
has entered into a cooperation agreement with the United States, has been
27 advised that he will be charged for his role in the prior scheme at the
conclusion of the investigation, and is cooperating in hopes that the United
28 States will file a motion for downward departure under 18 U.S.C. § 3553
and/or § 5K1.1 of the Sentencing Guidelines.

("CMGT").  Based on the evidence gathered in this case, much of which is discussed below, I believe Lindsay was involved, along with Giguiere, in the manipulation of the stock of Kelvin Medical, among others. The SUBJECT TELEPHONE was seized from Lindsay on July 5, 2018.

14.  According to its filings with the United States Securities and Exchange Commission ("SEC"), Kelvin Medical was a Nevada Corporation with its principal place of business in Nevada City, California, and purported to be an "early participant in medical device and telehealth wearables with a focus on the development of artificial intelligence driven physical therapeutic technologies."

THE MANIPULATION SCHEME REGARDING KELVIN MEDICAL, INC. STOCK

15.  According to CHS, and Giguiere's statements on recorded telephone calls, attorney Sharon Mitchell, who was Kelvin Medical's corporate counsel, contacted Giguiere about becoming involved with Kelvin Medical, Inc.

16.  Based on Giguiere's recorded statements, Mitchell was unable to collect on her legal fees from other individuals previously associated with Kelvin Medical.  Mitchell then approached Giguiere, who agreed to pay Mitchell's outstanding fees of $60,000 in order to obtain shares of Kelvin Medical stock and access to the company's management.

Control over Kelvin Medical Stock

17.  According to brokerage records obtained during the investigation, Phenix Ventures, LLC ("Phenix Ventures") purchased 1.5 million shares from an entity controlled by Mitchell, and deposited these shares in a domestic brokerage account (the "Domestic Brokerage Account").  According to Kelvin Medical's filings with the SEC, Giguiere was the "Managing Member" of Phenix Ventures.

18.   According to Giguiere's and Lindsay's recorded statements, and attachments to messages sent to and from these two individuals, Giguiere arranged for a nominee entity to purchase a separate 1.5 million shares from Mitchell.  According to brokerage records and Giguiere's and Lindsay's recorded statements, these shares were maintained in an entity's account at CMGT.  According to recorded statements made by Giguiere and Lindsay, Lindsay managed and controlled trading activity in this entity's account on behalf of Giguiere.

19.   According to Giguiere's recorded statements, he pursued other ways by which he could own or control most of Kelvin Medical's free-trading shares, including through additional purchases of stock directly from Kelvin Medical, and purchases of shares from "friends and family" of individuals previously associated with Kelvin Medical.

20.   During a recorded call on January 22, 2018 with Lindsay and CHS, Giguiere stated that "the attorney wants me not to buy them [the friends and family shares] in my name," so Giguiere wanted to purchase those shares "somehow through CMGT, using, you know, cash that we've created."   Lindsay responded: "We can do it tomorrow.   I have … a corporation we can use that has an account.   It will be a fresh name and everything."   Giguiere then stated: "Sell a little bit of what you have on hand and just use that cash."   Giguiere also stated that after his contemplated additional purchases of Kelvin Medical stock, he would own "100 percent of the balance" of the company's free trading stock.

21.   On March 9, 2018, Lindsay sent a message stating, in part, "it would be great to see the DTC."   Based on my training and experience, the phrase DTC refers to a list of a company's shareholders obtained from the Depository Trust Corporation, a securities clearinghouse. Giguiere responded: "Your universe owns all shares in the float."

"Building the Chart" through Manipulative Trading

22. Based on my training and experience, and discussions with securities regulators, I know that one type of manipulative trading involves matched trades. A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (a) creating a false or misleading appearance of active trading in any publicly traded security or (b) creating a false or misleading appearance with respect to the market for any such security.

23. Based on my training and experience, I believe that a number of statements made by the Giguiere and Lindsay show an intent to manipulate the price and volume of Kelvin Medical stock in late 2017 and early 2018 through matched trades.

24. On a November 27, 2017 recorded call with CHS, Giguiere made several references to manipulating Kelvin Medical stock. For example, Giguiere stated: "Now, if we have 1.5 million shares, well, we have three million shares to sell, well then that's, we can suck down a lot of traffic, right? … Because we can manage -- the nice thing about it is we can manage the price appreciation."

25. On the same call, CHS asked Giguiere "where would you like to see it on the 27th." Based on other statements during the call, I believe this question refers to the planned promotion start date on December 27, 2017. Giguiere responded "a dollar." Giguiere also stated on the call: "We've got 2.9 million shares, um, that, you know, we'll be able to sell as we allow this thing to go from a dollar to let's say 2 dollars."

26. On November 29, 2017, Giguiere stated in a message to Lindsay and CHS, "I have offers of $5,000 GTC ["good til close" orders] laddered

1 in .10 increments up to 1.00 FYI. … so you guys can do your thing now
2 as BMA is clear."

3     27.  In a November 30, 2017 text, CHS stated, in part: "ollie
4 [Lindsay], Thanks for the KV[MD] support bids/buys today. I think and
5 please G [Giguiere] chime in, it can just rest a few days."  Lindsay
6 responded: "Yes.  I'm leaking the ticker to a few greedy people in a
7 vague fashion.  Bids should be ther [sic].  But I agree w/ [CHS]."
8 Giguiere added: "I suggest 1500 to 2000 shares a day in KV[MD] at .55
9 and I will just have a large offer there showing min, for the next 5 to
10 7 trading days.  let's let a week go by right here with a little volume
11 and at this price. then we can move it."

12     28.  On December 5, 2017, Giguiere sent a message to Lindsay and
13 CHS stating "I will move BMA [Giguiere's brokerage firm] to offer 3,000
14 at .75 …, meaning I will drop them to 3000 from 50000 … and then Ollie
15 [Oliver Lindsay] can come in alongside them at .75."  He then stated "I
16 will have BMA then move to .85 at 1000.  … So they can sell a touch up
17 to 1.  … so will have them at .95 for 1000 and 1 for 1000."  Giguiere
18 also explained the reason for these bids and offers: "so it moves in
19 nickles [sic]."

20     29.  On and in many additional recorded calls and messages,
21 Giguiere made statements similar to the foregoing that, based on my
22 training and experience, represent an effort to coordinate trading and
23 thereby increase the published price and trading volume of Kelvin
24 Medical's stock.

25     30.  On December 8, 2017, Lindsay stated on a recorded call with
26 CHS, "for some reason I'm a little bit, uh, hesitant about typing in all
27 these details into this app.  ... You can just imagine if it finds its
28 way somewhere its fairly, ah, incriminating."

31.   On December 20, 2017, Lindsay stated on a recorded call with CHS: "You and I talked about this before.   I just mentioned to Gannon that some of these text messages look just like really evil.   I'd rather just pick up the phone."

32.   On a March 14, 2018 call with Giguiere, Lindsay and CHS, Lindsay stated "I don't like typing some of this, these details in so that's why I wanted to give a quick call."   Giguiere replied: "No, I totally agree, calls are, are, better, not trackable."

Corporate Disclosures

33.   On or about August 1, 2016, Kelvin Medical submitted to the SEC a registration statement on Form S-1 that stated: "We are a Medical Device technology company that engages in the development, eventual production and sale of a hot cold treatment device."   The device, according to the registration statement, was known as "Therm-N-Ice."

34.   On or about December 11, 2017, Giguiere participated on a recorded call with CHS.   Giguiere stated: "If you look at their materials, and you look at their S-1, there's really nothing, okay.   And when you ask management, there's really … there's kind of nothing there." CHS responded, in part, "so you're expanding his company .. and his story."   Giguiere replied: "Substantially….We're making the whole story up.   I mean this guy's story is I can put on a heat pad and a cold pad at the same time.   Not interesting."

35.   Giguiere stated on a January 17, 2018 group chat with Lindsay and CHS that he "[s]ent out KV Framework doc they are preparing to file 8K on."

36.   On or about January 18, 2017, Kelvin Medical submitted to the SEC a current report on SEC Form 8-K that stated "Kelvin Medical, Inc. is focused on developing and launching next generation telehealth

12

wearable technologies, for tracking, diagnostics, and therapeutic delivery, that positively impact one's health and well-being. Our strategy not only focuses on those seeking to age gracefully and pain free through telehealth management, but also on the most competitive athlete working to maximize their bodily output. Our Company intends to leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies to increase the recovery and performance of the body."

37. On a January 18, 2018 call with CHS, Giguiere stated: "When, when this was presented to them [Kelvin Medical management] their jaws just hit the table 'cuz they're like 'I don't even know what you're talking about but it sounds great.'"

Promotional Activity

38. As previously discussed, CHS has reported that Giguiere manages and controls a website known as TheMoneyStreet.com, which promotes certain companies and their stocks. CHS states that he worked with Giguiere on several stock promotions on TheMoneyStreet.com, including the promotion of Kelvin Medical and Eco Science Solutions.

39. On a recorded January 18, 2018 call with CHS, Giguiere stated that TheMoneyStreet.com's "landing page" for its promotion of Kelvin Medical was live, but "hidden". According to Giguiere's recorded statements, and agents' review of TheMoneyStreet.com website, the landing page became accessible to the public beginning on or about January 29, 2018 through in or about March 2018.

40. I am aware of evidence that Lindsay hired a phone room to promote Kelvin Medical stock. In a December 18, 2017 message to CHS about trading in Kelvin Medical stock, Lindsay attributed some trades

to a phone room.  "The bids this morning were phone room.  He'll do more tomorrow."

41.  According to popular financial websites, Kelvin Medical's stock price increased significantly during the period that Giguiere and Lindsay were involved in manipulative trading and promoting the stock. Its share price on November 29, 2017 was approximately $.22 per share. By March 20, 2018, the price was up to approximately $1.60 per share.

### False Statements to Securities Brokers

42.  On October 25, 2017, Giguiere represented to his securities broker in a "Rule 144 Seller's Representation Letter" that he "is not at present and has not been during the preceding three months, an officer, director, or 10% shareholder of the Company or in any other way an 'affiliate' of the Company."  Shortly thereafter, on November 1, 2017, Giguiere signed a questionnaire in which he answered "no" to the question "[d]oes the client [Giguiere] have any relationship with the issuer or its securities?"

### Sales of Kelvin Medical Stock

43.  According to brokerage records, Phenix Venture's domestic brokerage account obtained over $1.6 million from the sale of 1.5 million shares of Kelvin Medical stock from on or about November 29, 2017 through on or about January 16, 2018.  Many of these sales were to Lindsay's clients.

44.  In a March 12, 2018 message to Lindsay and CHS, Giguiere stated: "as for the 1.5 [million shares] you have at CMGT, let's offload that as quickly as we can…3M [shares] more coming..so net net would like to get 1.5 [million] sold at 1.5 [dollars per share] and change and the 3m [shares] sold at 2.5 to 3 [per share]."  Lindsay replied "yes!!"

14

45.  Based on a review of brokerage records, from on or about December 8, 2017 through on or about March 15, 2018, Lindsay sold, or caused to be sold, approximately 263,000 shares of Kelvin Medical stock from the CMGT Accounts for gross proceeds of approximately $375,110.49.

### The SEC's Suspension of Trading in Kelvin Medical Stock

46.  Based on information provided by the FBI, and the SEC's own analysis of the risks to investors who might transact in Kelvin Medical stock, the SEC suspended trading in the company's stock on March 20, 2018.

47.  Giguiere, Lindsay and CHS discussed what may have caused the suspension, and the ramifications, in many calls and messages, which began the same day they learned of the suspension.

48.  On a recorded March 20, 2018 with CHS, Giguiere speculated that the SEC reviewed Kelvin Medical's corporate disclosures and trading activity and concluded that the suspension was put in place because of several factors, including a significant increase in the company's stock price, and the lack of a product, employees, business or financing.

### PROBABLE CAUSE SURROUNDING THE SUBJECT TELEPHONE

49.  The SUBJECT TELEPHONE was seized from Lindsay by the FBI on July 5, 2018, at the time Lindsay was arrested pursuant to the indictment in this case.

50.  Giguiere (who lives in Orange County, California), Lindsay (who lived in the Cayman Islands), and CHS communicated frequently over the course of the Kelvin Medical scheme.  These communications included a significant volume of phone calls, emails, and text messages, including

1  messages transmitted via encrypted messaging platforms, such as WhatsApp
2  and Snapchat.

3  51.  Lindsay gave to CHS a specific phone number by which CHS could
4  communicate with Lindsay.  CHS used this phone number to contact Lindsay
5  throughout the manipulation schemes described above.  After the SUBJECT
6  TELEPHONE was seized, the FBI called the number that Lindsay gave to
7  CHS, and the SUBJECT TELEPHONE rang.

8  52.  On a recorded call, CHS asked Lindsay what devices he uses to
9  communicate with CHS.  Lindsay stated he uses one or more iPhones for
10  all of his communications, including SnapChat, WhatsApp, Telegram, and
11  Proton mail.

12  53.  Based on training and experience, the encrypted apps Lindsay
13  used to communicate with Giguiere and CHS are often used on a cell phone,
14  and these apps are readily available in the relevant app stores.

15  PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

16  54.  It is not possible to determine, merely by knowing the cellular
17  telephone's make, model and serial number, the nature and types of
18  services to which the device is subscribed and the nature of the data
19  stored on the device.  Cellular devices today can be simple cellular
20  telephones and text message devices, can include cameras, can serve as
21  personal digital assistants and have functions such as calendars and
22  full address books and can be mini-computers allowing for electronic
23  mail services, web services and rudimentary word processing.    An
24  increasing number of cellular service providers now allow for their
25  subscribers to access their device over the internet and remotely destroy
26  all of the data contained on the device.  For that reason, the device
27  may only be powered in a secure environment or, if possible, started in
28  "flight mode" which disables access to the network.    Unlike typical

1 computers, many cellular telephones do not have hard drives or hard
2 drive equivalents and store information in volatile memory within the
3 device or in memory cards inserted into the device.  Current technology
4 provides some solutions for acquiring some of the data stored in some
5 cellular telephone models using forensic hardware and software.  Even
6 if some of the stored information on the device may be acquired
7 forensically, not all of the data subject to seizure may be so acquired.
8 For devices that are not subject to forensic data acquisition or that
9 have potentially relevant data stored that is not subject to such
10 acquisition, the examiner must inspect the device manually and record
11 the process and the results using digital photography.  This process is
12 time and labor intensive and may take weeks or longer.

13    55.  Following the issuance of this warrant, investigators will
14 collect the subject cellular telephone and subject it to analysis.  All
15 forensic analysis of the data contained within the telephone and its
16 memory card will employ search protocols directed exclusively to the
17 identification and extraction of data within the scope of this warrant.

18    56.  Based on the foregoing, identifying and extracting data
19 subject to seizure pursuant to this warrant may require a range of data
20 analysis techniques, including manual review, and, consequently, may
21 take weeks or months.  The personnel conducting the identification and
22 extraction of data will complete the analysis within ninety (90) days,
23 absent further application to this court.

24                               CONCLUSION

25    57.  Based on the foregoing, there is probable cause to believe
26 that the items identified in Attachment B have been used in the
27 commission of a crime and constitute evidence, fruits, and
28 instrumentalities of violations of conspiracy to commit securities fraud

1   in violation of 18 U.S.C. § 371, and securities fraud in violation of

2   15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, and will be found

3   at the telephone to be searched as provided in Attachment A.

4   _____

5   Special Agent John Roberts
    Federal Bureau of Investigation

6

7   Subscribed and sworn to before me this  14  day of December, 2018.

8

9   _____

10  HONORABLE BARBARA L. MAJOR
    UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit B

AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

MAR **0 6** 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

# UNITED STATES DISTRICT COURT

### for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

One iPhone 6, white in black case, with serial number
DNPQ94MCGRYH, currently located at 10385 Vista
Sorrento Parkway, San Diego, CA 92121

)
)
)
)
)
)

Case No.  **1 9 M J 0 9 6 4**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under
penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the
property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the
person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 USC § 371 | Conspiracy | |
| 15 U.S.C. § § 78j(b), 78ff, and | Securities Fraud | |
| 17 C.F.R. § 240.10b-5 | | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Stephanie Schuld
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/6/19

_____
*Judge's signature*

City and state:  San Diego, California

U.S. Magistrate Judge Linda Lopez
*Printed name and title*

**AFFIDAVIT**

I, Stephanie Schuld, being duly sworn, state as follows:

**INTRODUCTION**

**A.   Purpose of This Affidavit**

1.     I make this affidavit in support of an application for a follow-on search warrant to seize additional items found on a cellular telephone belonging to Oliver Lindsay – an iPhone 6, white in black case, with serial number DNPQ94MCGRYH (the "Subject Telephone") – pursuant to a search warrant issued by the Honorable Barbara L. Major on December 14, 2018 in 18-mj-6297 (the "Prior Warrant"). This affidavit incorporates by reference the affidavit in support of the Prior Warrant, which is attached as Exhibit A.

2.     On June 29, 2018, a grand jury sitting in the Southern District of California handed down an indictment against defendants Oliver Lindsay and Gannon Giguiere. The indictment alleges, *inter alia*, that Lindsay and Giguiere conspired to commit securities fraud, and committed securities fraud, in connection with the stock of Kelvin Medical, Inc. A superseding indictment, handed down on January 25, 2019, added manipulative trading in Kelvin Medical stock as an object of the conspiracy.

3.     Lindsay and Giguiere were arrested on July 5, 2018. They were both carrying cell phones, which were seized.[1] The Subject Telephone is one of the cell phones seized from Lindsay. Agents are reviewing exported data from the Subject Telephone to identify materials which are subject to seizure pursuant to the Prior Warrant.

4.     Based on the information below, I submit that there is probable cause to believe that additional information from the Subject Telephone, not currently subject to seizure under the Prior Warrant, will contain evidence of the following crimes: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; and securities fraud (insider

---

[1] Defendant Giguiere's cell phone was searched pursuant to a separate search warrant, but agents were unable to access the content of the data on that phone.

1

trading), in violation of 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5; as more fully identified in Attachment B.

5. All the conclusions and beliefs set forth in this affidavit are based on my training and experience, conversations with other agents who have extensive experience in securities fraud investigations, and my knowledge of the facts of this investigation. All of the dates, times, and amounts listed in this affidavit are approximate. This affidavit sets forth only the facts necessary to support the issuance of the requested search warrant; it does not include each and every fact known to me concerning this investigation.

**B.    Training and Experience**

6. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since January 2010. I am currently assigned to the San Diego Division's financial crimes squad. Prior to working financial fraud cases, I spent more than four years investigating public corruption.

7. Before I joined the FBI, I received a Bachelor of Arts degree in business with an emphasis in accounting and finance from Bethel University. Following graduation, I was employed by a publicly-held Fortune 500 company as a Staff Accountant, Division Accounting Manager, and lastly, a Controller. While at this company I gained more than five years of experience compiling and analyzing financial information.

8. As a Special Agent, I received basic federal law enforcement training at the FBI Academy in Quantico, Virginia. My training at the FBI Academy included instruction in how to conduct searches in accordance with the Fourth Amendment, the drafting of search warrant affidavits, and the probable cause standard.

9. During my career as an FBI Agent, I have investigated various white collar crimes, including mail fraud, wire fraud, embezzlement, bribery, money laundering, public corruption, and conspiracy to commit these offenses.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROBABLE CAUSE**

**C.   Pump and Dump / Market Manipulation of Kelvin Medical Stock**

10.   As outlined in Exhibit A, there is probable cause to believe that defendants Lindsay and Giguiere were part of a conspiracy to commit securities fraud by engaging in a pump-and-dump and market manipulation scheme in connection with Kelvin Medical stock.   That scheme is the subject of allegations in the indictment and superseding indictment in *U.S. v. Giguiere, et al.*, 18CR3071-WQH.

**D.   Relevant Individuals and Entities**

11.   Oliver Lindsay - According to U.S. law enforcement databases, Lindsay is a Canadian citizen.   According to Lindsay's statements during recorded phone calls, Lindsay primarily resides in Georgetown, Cayman Islands.   Based on Lindsay's statements during recorded phone calls, Lindsay operated an offshore brokerage firm known as CMGT Capital Management ("CMGT"). According to documents obtained from FINRA, the securities regulator, CMGT, Inc., was an affiliate of CMGT.   Based on the evidence gathered in this case, much of which is discussed below, I believe Lindsay was involved, along with Giguiere and others, in illegal insider trading in the stock of Long Island Iced Tea Corp. (ticker: LTEA).

12.   Gannon Giguiere - Based on his recorded statements, a review of the website itself, and according to CHS, Giguiere has operated a stock promotion website called TheMoneyStreet.com since at least as early as 2016.   Based on the evidence gathered in this case, some of which is discussed below, I believe Giguiere was involved, along with Lindsay and others, in illegal insider trading in LTEA stock.

13.   CHS - CHS[2] has admitted to investigators that he has been involved in penny stock fraud for many years, and has had contact with many other repeat players in the

_____

[2] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme

3

industry. CHS states that, since at least as early as 2016, he was involved in the promotion of stocks through TheMoneyStreet.com. CHS and his associate, Giguiere, paid for advertisements on websites like Yahoo Finance, where a click on the ad links to a TheMoneyStreet.com landing page touting a particular stock. CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with Giguiere, Lindsay, and others regarding the manipulation of many stocks.

14.   Long Island Iced Tea Corp. - A Form S-1 registration statement (the "LTEA Form S-1") submitted by LTEA to the Securities and Exchange Commission (SEC) on November 22, 2017 stated that the company was "engaged in the production and distribution of premium Non-Alcoholic Ready-to-Drink ('NARTD') beverages. We are currently organized around our flagship tea product under the brand Long Island Iced Tea®." LTEA's stock was publicly traded on the Nasdaq Capital Market. On December 21, 2017, the company disseminated a press release entitled "Long Island Iced Tea Corp. to Rebrand as 'Long Blockchain Corp.': Corporate Focus to Shift Towards Opportunities Strategic to Blockchain technology." LTEA's stock price increased significantly based on this press release. The company also changed its ticker symbol from LTEA to LBCC.

15.   Eric Watson - According to the LTEA Form S-1, Eric Watson was a significant shareholder in LTEA in late 2017. The LTEA Form S-1 stated that Watson owned 1,502,821 LTEA shares, which represented a 15.1% beneficial ownership in the company, on or about November 20, 2017.

relating to the 2012 manipulation Cuba Beverage Company. When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice. CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

**E.      CHS's Communications with Defendants Lindsay and Giguiere**

16.     Communications recorded by CHS reveal that Giguiere and Lindsay discussed an overall plan, and the day-to-day execution, surrounding their scheme to manipulate the stock of Kelvin Medical, and to promote Kelvin Medical stock on TheMoneyStreet.com. These communications took place from at least as early November 2017 through on or about July 5, 2018.

**F.      Review of the Subject Telephone Pursuant to the Prior Warrant**

17.     Since extracting data from the Subject Telephone, agents have been reviewing its contents in an effort to identify and seize the evidence described in Attachment B to the Prior Warrant. This review includes communications by, between or among Lindsay, Giguiere, and/or CHS.

18.     During their review of these communications, agents identified several text messages conveying information regarding promotional efforts, including on TheMoneyStreet.com. Specifically, when agents searched the Subject Phone for records containing the term "TheMoneyStreet," the review platform they were utilizing displayed a text message "conversation" between Lindsay and Watson. The conversation included encrypted text messages that were exchanged between September 19, 2017 and December 23, 2017. Many of the text messages conveyed information directly relevant to efforts to promote stocks (*e.g.*, upcoming corporate announcements), and one text message in the conversation specifically linked to a TheMoneyStreet.com page. Because the topics and the timeframe of the conversation fell within the scope of the Prior Warrant, agents reviewed the conversation in detail.

19.     Among other things, the record of the conversation between Lindsay and Watson (referred to herein as the "LTEA Plain View Materials") concerned TheMoneyStreet's promotion of LTEA, and draft press releases regarding a change in LTEA's business focus and strategic plan. One such draft LTEA press release stated that

"[t]he primary focus of the Company will now be the exploration of and investment into opportunities that leverage the benefits of blockchain technology. The Company will continue to operate its subsidiary, Long Island Brand Beverages, LLC, as a beverage business focused on the ready-to-drink segment of the beverage industry."

20.     As set forth in greater detail below, the timing of the communications found in the LTEA Plain View Materials fit into a chronology that gives rise to probable cause to believe that defendants Lindsay and Giguiere engaged in a conspiracy to commit insider trading, and committed insider trading, in LTEA stock.

## G.     **Information Regarding Long Island Ice Tea Corp.**

21.     According to documents that the SEC obtained from LTEA through an administrative subpoena, LTEA had in place an insider trading policy that forbade insiders from using material, non-public information about the company to trade its stock, or to share such information with others for the purpose of trading its stock.

22.     Based on a review of the contents of TheMoneyStreet.com, the website promoted the stock of LTEA in November 2017 under the URL http://www.themoneystreet.com/read-the-tea-leaves-time-to-go-long-in-the-ready-to-drink-market/ (the "LTEA Promotion"). Based on my training and experience, I know that the term "going long" often means engaging in a transaction that will increase in value if the subject industry or company experiences success (or is perceived as successful by market participants).

23.     The LTEA Plain View Materials contain a November 14, 2017 text message from Watson to Lindsay. The text message attached a document entitled "Stater: Crypto IM Draft.pptx." The cover page of this document reveals that the document concerns "Stater Global Markets[:] Equity Investment Deck – Nov 2017." The remainder of the document discusses Stater Global Market's purported focus, background, and the "Crypto Currency Market Opportunity." The LTEA Plain View Materials further contain a text

message on November 16, 2017, that also attaches a document entitled "Stater: Crypto IM Draft.pptx," which appears to be a revision of the document that Watson sent to Lindsay on November 14, 2017.

24.    On December 4, 2017, CHS recorded a call with Lindsay. On that call, Lindsay described his discussions with others regarding LTEA. Specifically, Lindsay stated to CHS: "The guy behind the deal, Eric, was trying to get me to find a Canadian vehicle to vend in a currency trader out of the U.K. called Stater … Stater.com, or something like that. … He thinks that he's got approval from a majority of the shareholders to vend in to LTEA as a blockchain deal and, like, add this like blockchain element to an existing currency trader. So it could be a massive press release, actually." Lindsay also stated on the call that "Gannon [Giguiere] should try to conserve as much of that budget as possible without burning his, uh, his, his relationships. Because we're going to need it when comes – I mean, it will be good to have it when we come out." Lindsay also stated to CHS: "When Eric is going around to … shareholders, he's revealing a little bit to them. He's telling them that they're now [sic] inside information, they can't transact the stock, but there's gonna be some leakage there. Like, there's going to be some people that are going to start bidding the stock up." Lindsay also stated: "He thinks he can announce an LOI early next week." Based on my training and experience, and my knowledge of the investigation, I believe the term "vend in" refers to a merger of a public company (with stock that trades in the securities markets) and a private company; the term "budget" refers to money that has been or will be spent on TheMoneyStreet.com's promotion of LTEA and its stock; and the term "LOI" refers to a letter of intent surrounding a potential merger of LTEA with a block chain company.

25.    On December 7, 2017, Giguiere sent an email to Lindsay, CHS, and a third party stating "Can you please proton me the deck and all supporting information around the Crypto transaction in LTEA?" Later the same day, Lindsay sent to Giguiere and CHS

an email attaching a document entitled "Crypto IM Draft.pptx." This document appears to be the same as the one that Lindsay received via text message from Watson on November 16, 2017.

26.    According to communications found in the LTEA Plain View Materials, defendant Lindsay sent an encrypted text message to Watson with a link to the LTEA promotion on TheMoneyStreet.com on November 16, 2017.

27.    According to communications found in the LTEA Plain View Materials, on December 9, 2017, Lindsay sent an encrypted text message to Watson. The message forwarded what appears to be a message Lindsay had received from a third party. Lindsay also stated the following: "Getting really embarrassing to receives [sic] notes like this from clients, especially when it's happened days ago and I sound like I haven't a clue. Asking wtf I've gotten them in to. [...] This things getting cornered into a toxic spiral. Chance of an LOI saving it … slim. Some other magic ace going to save it!?"

28.    According to communications found in the LTEA Plain View Materials, on December 19, 2017, at 3:58 P.M.,[3] Watson sent defendant Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v2.docx." This document concerned transitioning the company to focus on block chain technology.

29.    According to communications found in the LTEA Plain View Materials, on December 19, 2017, at 7:57 P.M., Watson sent Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v4 clean.docx." This version of the press release also concerned transitioning the company to focus on block chain technology.

30.    According to communications found in the LTEA Plain View Materials, on December 20, 2017, at 4:02 A.M., Watson sent defendant Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v5 sw

[3] Pacific Time is used herein, unless otherwise noted.

clean.docx." This version of the press release also concerned transitioning the company to focus on block chain technology.

31.    Lindsay sent a text message attaching a document entitled "LIIT Press Release_Block Chain_v5 sw clean.docx" to Giguiere and CHS on December 20, 2017 at 4:53 A.M.   Between 5:37 A.M. and 6:11 A.M., Giguiere, Lindsay and CHS exchanged the following encrypted text messages:

> *Giguiere: \*interesting*
>
> ...
>
> *Giguiere: This release drops today, correct?*
>
> *Lindsay: Should be now ... or post market*
>
> ...
>
> *Lindsay:  I guess we will know shortly*
>
> *Giguiere: Yes*

32.    According to FINRA, it conducted an investigation of possible insider trading in LTEA in and around December 2017.  During its investigation, FINRA staff members obtained brokerage account documentation from LTEA's stock transfer agent, Continental Stock Transfer.   This documentation shows that CMGT, Inc., acquired 332,500 LTEA shares in connection with an offering of shares by LTEA on November 16, 2017 (*i.e.*, CMGT Inc. did not purchase these shares in the market – rather, CMGT, Inc., received the shares from LTEA itself).[4]

---

[4] FINRA staff members also obtained account documentation from State Street Bank. According to FINRA, this documentation shows that CMGT, Inc., purchased 1,673 LTEA shares, and sold 2,000 LTEA shares on November 28, 2017; sold 12,000 LTEA shares on December 21, 2017, and purchased 9,800 LTEA shares between December 22 and December 26, 2017.  FINRA calculated realized profits on these transactions of $40.

33.   During its investigation, FINRA staff members obtained account statements and trade blotters for brokerage accounts held in the name of "Gannon K. Giguiere," and in the name of Giguiere's wife, Lindsay Giguiere.  Those materials show the following activity in these accounts on December 20, 2017:

(a)   At or about 8:49 A.M., a brokerage account in the name of Gannon K. Giguiere (the "Gannon Giguiere Brokerage Account"), held at Robinhood Financial LLC, purchased 17,500 shares of LTEA for approximately $42,350, for an average cost of $2.42 per share.[5]

(b)   Between at or about 8:54 A.M. and 9:37 A.M., a brokerage account in the name of Lindsay Giguiere (the "Lindsay Giguiere Brokerage Account"), held at Scottrade, Inc., purchased 17,500 shares of LTEA for approximately $42,350, for an average price of $2.42 per share.[6]

34.   The market for LTEA stock closed at $2.44 per share on December 20, 2017.

35.   According to a chronology of events that LTEA submitted to FINRA for purposes of the referenced FINRA examination, at 5:32 A.M. on December 21, 2017, LTEA disseminated a press release (the "Blockchain Press Release") entitled "Long Island Iced Tea Corp. to Rebrand as 'Long Blockchain Corp.': Corporate Focus to Shift Towards Opportunities Strategic to Blockchain technology."

36.   At 5:43 A.M. on December 21, 2017, Lindsay sent a text message to Giguiere and CHS stating "LT $11 On News."

---

[5] According to FINRA, the Robinhood Financial account statements gathered by FINRA also show that this account purchased 52,250 shares, and sold 98,770 shares between November 29, 2017 and December 27, 2017.

[6] According to FINRA, the Scottrade account statements gathered by FINRA also show that this account purchased 24,000 shares, and sold 51,750 shares between December 4, 2017 and December 27, 2017.

10

37.   According to communications found in the LTEA Plain View Materials, on December 21, 2017, between 6:28 A.M. and 6:29 A.M., Watson and defendant Lindsay exchanged the following text messages:

*Watson: Smiling ?*

*Lindsay: Laughing ... Good job getting that done*

*Watson: Thanks. A fucking lot of brain damage. When the market sees the Stater deal we may have a $50 stock*

38.   At 7:16 A.M. on December 21, 2017, Giguiere sent text messages to Lindsay and CHS stating "Nice pop in LT ... Amazing the hype around crypto ... The story will pull well on TMS ... are we going to continue with marketing for LT?" Based on my knowledge of this investigation, I believe that LT refers to LTEA, and TMS refers to TheMoneyStreet.com.

39.   On the morning of December 21, 2017, the accounts of Giguiere and his wife sold the same volume of LTEA shares they had acquired the day before, *i.e.*, before the Blockchain Press Release was disseminated.  More specifically, the brokerage account documents obtained by FINRA show that:

   a.   Between 10:08 and 10:11 A.M., Gannon Giguiere Brokerage Account sold 17,500 shares of LTEA for approximately $125,925, at an average price of $7.20 per share.

   b.   At or about 10:09 A.M., the Lindsay Giguiere Brokerage Account sold 17,500 shares of LTEA for approximately $121,726, at an average price of $6.96 per share.

   c.   Cumulatively, the LTEA transactions in the Gannon Giguiere Brokerage Account and the Lindsay Giguiere Brokerage Account on December 20 and 21, 2017, produced proceeds of approximately $247,651, and generated gross profits of over $162,000.

11

40.     According to a Form 10-K submitted by LTEA to the SEC on April 13, 2018, the company had been delisted from the Nasdaq Capital Market in February 2018. Specifically, the Form 10-K stated: "[O]n February 15, 2018, we received a notice from NASDAQ stating that NASDAQ had determined to delist our securities under the discretionary authority granted to NASDAQ pursuant to NASDAQ Rule 5101. The notification letter stated that NASDAQ believed that we made a series of public statements designed to mislead investors and to take advantage of public interest in bitcoin and Blockchain technology, thereby raising concerns about our suitability for exchange listing." I know from my training and experience that when NASDAQ delists a security, it may not trade on or through the NASDAQ Capital Market unless the associated company takes steps to relist the security.

## CONCLUSION

41.     Based on the foregoing, there is probable cause to believe that Giguiere and Lindsay conspired to and did trade LTEA securities on the basis of material, non-public information, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5. Further there is probable cause to believe that the items to be seized in Attachment B will be found on the Subject Telephone as described in Attachment A.

Respectfully submitted,

Stephanie Schuld
FBI Special Agent

Subscribed and sworn to before me on March _b_, 2019

HON. LINDA LOPEZ
United States Magistrate Judge

12

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

One iPhone 6, white in black case; currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121 (the "Subject Telephone").

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the SUBJECT TELEPHONE described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT TELEPHONE. The seizure and search of the SUBJECT TELEPHONE will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT TELEPHONE will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of November 1, 2017 to July 5, 2018:

a.   Tending to identify attempts to trade the stock of Long Island Iced Tea Corp., its predecessors, successors and affiliates (collectively, "LTEA"), on the basis of material, non-public information, including attempts to:

    1.   Obtain material, non-public information regarding LTEA.

    2.   Pass on to others material, non-public information regarding LTEA.

    3.   Determine others who had, or did not have, access to material, non-public information regarding LTEA.

    4.   Determine the likely impact any material, non-public information regarding LTEA might have on the price or trade volume of LTEA stock.

    5.   Promote the stock of LTEA including through call rooms, newsletters, or websites, including but not limited to, www.TheMoneyStreet.com.

    6.   Identify payments, and the routing of payments, for the promotion of the stock of LTEA.

    7.   Buy or sell the stock of LTEA.

    8.   Distribute proceeds from the sale of the stock of LTEA.

b.      Tending to identify accounts, profiles, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the trading of LTEA stock based on material, non-public information.

c.      Tending to identify payment, payment methods, or other monetary transactions relating to the trading of LTEA stock based on material, non-public information.

d.      Tending to identify co-conspirators, criminal associates, or others involved in the promotion or trading of LTEA stock based on material, non-public information.

e.      Tending to identify travel to or presence at locations involved in the trading of LTEA stock based on material, non-public information.

g.      Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

h.      Provide context to any of the communications, records, or data described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the Exhibit A.